

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-15-879

| | |
|---|---|
| LINDSEY GIBSON<br><br>APPELLANT<br><br>V.<br><br>MORGAN KEENER<br><br>APPELLEE | **Opinion Delivered** August 31, 2016<br><br>APPEAL FROM THE BOONE COUNTY CIRCUIT COURT [NO. 05-DR-10-165]<br><br>HONORABLE SHAWN A. WOMACK, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

This case started as a paternity action initiated by the Office of Child Support Enforcement (OCSE). Lindsey Gibson and Morgan Keener are the mother and father of seven-year-old K.K. An agreed order entered in August 2010 established Keener as K.K.'s father, granted OCSE a judgment for retroactive child support, established Keener's support obligations, and recognized that Gibson, as K.K.'s birth mother, had sole legal custody of K.K. pursuant to Arkansas Code Annotated section 9-10-113. A November 2010 order established Keener's visitation rights. When these orders were entered, K.K. was only a year old; Keener and Gibson were not married and had never lived together.

Shortly thereafter in 2011, Gibson and K.K. moved into Keener's home and lived together as a family unit. In February 2012, an agreed order was entered abating Keener's obligation to pay child support. In June 2014, Gibson and K.K. moved out of Keener's

home, and the parties abided by the visitation schedule contained in the circuit court's November 2010 order. That order gave Keener visitation every other weekend.

The latest round of litigation resulting in this appeal started in July 2014 when OCSE filed a motion to set child support because (1) Gibson and Keener were no longer cohabiting and (2) Keener was no longer providing support for K.K. In August 2014, Keener filed a cross-claim against Gibson, alleging that circumstances had changed because he established a relationship with K.K. by residing in the same home for the past three years, that he had supported K.K., and that it was in K.K.'s best interest for Keener to be granted joint custody.

Gibson appeals the circuit court's decision to give Keener joint custody of K.K. and to increase his visitation time. We affirm.

I.

This court performs a de novo review of child-custody matters, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Smith v. Parker*, 67 Ark. App. 221, 998 S.W.2d 1 (1999). We recognize and give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Sharp v. Keeler*, 99 Ark. App. 42, 256 S.W.3d 528 (2007).

Arkansas Code Annotated section 9-10-113 sets forth the law regarding custody of a child born out of wedlock:

> (a) When a child is born to an unmarried woman, legal custody of that child shall be in the woman giving birth to the child until the child reaches the age

2

of eighteen (18) years unless a court of competent jurisdiction enters an order placing the child in the custody of another party.

(b) A biological father, provided he has established paternity in a court of competent jurisdiction, may petition the circuit court in the county where the child resides for custody of the child.

(c) The court may award custody to the biological father upon a showing that:

    (1) He is a fit parent to raise the child;

    (2) He has assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child; and

    (3) It is in the best interest of the child to award custody to the biological father.

Ark. Code Ann. § 9-10-113(a)–(c) (Repl. 2015).

In *Norwood v. Robinson*, 315 Ark. 255, 866 S.W.2d 398 (1993), our supreme court held that a permanent order establishing paternity and awarding visitation rights to a father was an implicit custody award in the mother. In other words, an award of visitation to the father was tantamount to a finding that he was not entitled to custody and that the custody of the child should be with the mother—by order, not statute. *Harmon v. Wells*, 98 Ark. App. 355, 358, 255 S.W.3d 501, 503 (2007). Therefore, the father was prohibited from gaining custody of the child absent a showing of changed circumstances. *Id.* This means that a noncustodial parent seeking a custody change must prove that a material change in circumstances has occurred and that a change in custody is in the best interest of the child. *See Donato v. Walker*, 2010 Ark. App. 566, at 5, 377 S.W.3d 437, 440.

SLIP OPINION

II.

For her first argument on appeal, Gibson contends that the circuit court's custody ruling was predicated on "an inapplicable statute dealing with initial custody awards in divorce actions." Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) states, "*In an action for divorce*, an award of joint custody is favored in Arkansas." (Emphasis added.) The circuit judge in this case stated in his oral ruling that

> I want to make one other observation. One other factor that weighed into my decision was the statute that was changed by the legislature last year deals with joint custody. This addresses joint custody, the statute that creates, and I'm a fan of joint custody, equal time where it is workable, reasonable and appropriate. The statute that creates the new law on that is specifically contemplated in the event of divorce where the couple was married.
>
> I think where there was a family unit that included a marriage, you get the benefit of some of those extra things that you all just do. So one of the reasons, not the only reason, but one of the reasons we are not getting all the way up to 7 and 7 out of those 14 nights is that this is not a situation where this child is coming out of the marital home. This is a paternity situation. There was no relationship. There was a stair-step relationship. There was cohabitation and then there was a breakup and that's different. Even though some aspects may be similar, that's a different environment than a marital relationship that the legislature contemplated being a transition as joint custody.

Gibson argues that this statement by the circuit court was clear error. In *Ryan v. White*, 2015 Ark. App. 494, 471 S.W.3d 243, we held that while the circuit court did not err in acknowledging the "favored" status of joint custody under section 9-13-101, it does not "directly apply" when a father seeks joint custody of a child born out of wedlock. In *Ryan* we wrote,

> We acknowledge that the "favored" status of joint custody specifically applies in divorce cases rather than custody cases involving children born to unmarried parents but note that section 9-10-109 expressly provides that,

SLIP OPINION

once paternity has been established, the court is ordered to follow "the same guidelines, procedures, and requirements . . . as if it were a case involving a child born of a marriage in awarding custody [and] visitation. . . ." Ark. Code Ann. § 9-10-109 . . . Once paternity is established, the presumption of awarding custody to the mother is erased, and the biological father is afforded the same right to establish a parental and custodial relationship with the child to which a married parent is entitled.

*Ryan*, 2015 Ark. App. 494, at 8, 471 S.W.3d at 248. Like the court in *Ryan*, the circuit court here did not err in acknowledging the favored status joint custody receives under section 9-13-101. We therefore affirm on this point.

## III.

Gibson next argues that the circuit court erred in finding a material change in circumstances and the joint-custody award was reversible error because "cooperation between [her] and Keener was lacking." As we mentioned earlier, the circuit court convened a hearing on Keener's change-of-custody request in May 2015. The parties and various witnesses testified about Gibson and Keener's relationship and the parties' individual parenting styles.

During the hearing, Keener testified that K.K. lived in his house for almost four years and that they had developed a close bond. He bathed, fed, and put K.K. to bed and took him hunting and bowling. According to Keener, Gibson did not maintain a regular bedtime schedule for K.K. and failed to address several cavities in K.K.'s mouth even after K.K. had complained about his teeth hurting. Keener's father Lynn, a dentist, testified that K.K. has an excessive number of cavities and needs to take sodium fluoride tablets. According to Margie (Keener's mother), Keener did everything for K.K. when he and Gibson lived

together. Keener also indicated that he and Gibson "have had a problem with communication" but that he was able to communicate with Gibson on the phone.

Keener explained that he wanted joint custody, in part, because K.K. can't develop a close relationship with Keener's parents on a standard visitation schedule. Keener has a "close-knit" family. Keener has a teaching job close by, but if he is not available, his mother can help pick up K.K. from school.

For her part, Gibson produced evidence that Keener never voluntarily paid child support after K.K. was born, nor did he contact or visit K.K. until OCSE initiated a child-support action. Once Keener and Gibson moved in together, Gibson still did almost all the caretaking of K.K. Keener was gone often on the weekends hunting and fishing and would leave K.K. with Gibson. Keener's "noncommunication" and "hateful" speech made for an unhappy relationship, according to Gibson.

Gibson presented evidence of Keener's alcohol use. Keener had prior DWIs. According to Gibson, Keener drank every night and frequently went out drinking with friends. Gibson's friend viewed Keener's frequent drinking as a problem and testified about it. Gibson's mother testified that Keener was "intoxicated every time he was at my home" and that she saw him "very, very, very, very drunk many times with K.K. around." Keener, for his part, admitted drinking "four or five beers every night," but denied that it caused him any problems. According to Keener, Gibson drank sometimes, too.

Gibson also testified that Keener allowed his father to perform dental work on K.K., without telling Gibson. K.K.'s gum was raw and swollen. Gibson also expressed her frustration that Keener never attended any of K.K.'s soccer games. The breaking point for

their relationship, according to Gibson, was when Keener didn't want to have a birthday party for K.K.

At the conclusion of the hearing, the court found that a material change in circumstances existed and granted Keener's request "for joint legal custody."  The court then stated that it would "deny the request for joint physical custody to the extent that it would provide for an equal division of time[.]"  The court set Thursday to Tuesday as the "default" schedule, expanding Keener's time with K.K. from 2 of 14 nights to 5 of 14 nights.  Summer visitation was changed to alternating two-week periods with each parent.  After fielding a few follow-up questions, the court said:

> And, let me, this is not part of the order, so this is just kind of one of the many factors that went into my decision-making process.  Where we have two reasonable parents that both do well with their children, it is important to have as much contact as reasonable or practical so that those relationships can be maintained and expanded on both sides.
>
> One thing we do not get, and this is actually something that your client [Gibson] complained about, was that he gets all the fun time on the weekends and when all we have is Friday to Sunday every other weekend, so one thing we do not get is the non-custodial parent participating in the responsibility of getting the child to bed on time, getting the child up on time, getting the child to school on time, taking backpacks, doing homework, that's part of my rationale for including the school months in there as I did.

On May 21, before the court's written order was entered, Gibson filed a motion under Arkansas Rule of Civil Procedure 52, requesting that the court make certain written findings and asked the court to consider changing visitation for Keener from Thursday afternoon until the following Monday afternoon (instead of Tuesday morning).  Among other things, Gibson also asked that Keener be held in contempt for "admitting in court

that he drank alcohol on two occasions in front of the minor child." No written order denying or granting Gibson's motion was entered.

The appealed custody order, entered on July 9, states,

The Court finds there has been a change in circumstances since the entry of the last Order entered herein sufficient to warrant a modification of the custody/visitation provisions . . . . The Petitioner [Keener] and Respondent [Gibson] are hereby awarded joint legal custody of their minor child[.]

The circuit court does not identify the factual basis for its conclusion that a material change had occurred. Where the circuit court fails to make findings of fact about a change in circumstances, this court, under its de novo review, may nonetheless conclude that there was sufficient evidence from which the circuit court could have found a change in circumstances. *McNutt v. Yates*, 2013 Ark. 427, at 8, 430 S.W.3d 91, 97. Such is the case here. The July 9 order also does not state that a change in custody is in K.K.'s best interest. Because there is a presumption that a circuit court made the findings necessary to support its judgment, we presume that the court considered K.K.'s best interest when awarding joint custody. *See Hoover v. Hoover*, 2016 Ark. App. 322, at 8.

Turning to the record in our de novo review, we conclude that there was a material change in circumstances sufficient to reopen the issue of child custody. The last order addressing custody was entered in 2010. It is undisputed that, at the time the 2010 order was entered, the parties had never lived together and K.K. was only one year old. Shortly after the entry of the 2010 order, Gibson and K.K. moved into Keener's home, and the parties lived together until their separation in June 2014. On the whole, the evidence demonstrated that Keener's relationship with young K.K. had blossomed into a parent–child

relationship that had not yet begun when the last custody order was entered, resulting in a material change in circumstances.

Recognizing the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest, we are not left with a definite and firm conviction that the court made a mistake in awarding joint custody. Although there was conflicting testimony on many issues, including Keener's alcohol use and how much involvement Keener had with K.K.'s care, the circuit court ultimately determined that Gibson and Keener were "two reasonable parents that both do well" with their child. While both parents candidly admitted that they had trouble communicating with one another at times, there was also evidence that they were capable of communicating well enough to co-parent K.K. The parties live relatively close to one another. The court created a sensible visitation schedule designed to maximize K.K.'s relationship with both his mother and his father. We therefore see no error and affirm.

Affirmed.

GLOVER and VAUGHT, JJ., agree.

*Sexton Law Firm*, by: *Jane Watson Sexton*, for appellant.

*Carney Law Firm*, by: *Jodi G. Carney*, for appellee.